[No. 20230. Department Two. May 12, 1927.]

GRANT SHEFFIELD, *Respondent,* v. W. C. BAKER *et al.,*
*Appellants.*[1]

[1] CONSPIRACY (7)—EXCHANGE OF PROPERTIES (3)—FRAUD—EVI-
DENCE—SUFFICIENCY. There was an entire failure of proof of
a conspiracy by two agents and an owner, to defraud plaintiff
in a real estate trade, where the fraud was founded on the
fact that plaintiff was induced to make an even trade when
the other owner was willing to give $2,800 additional if neces-
sary, and such fact was communicated to such other parties'
agent only, and was not known to plaintiff's agent, who did
not share in or gain thereby; especially where plaintiff did not
claim that his bargain was not as good as represented and did
not offer to rescind.

[2] APPEAL (169)—PARTIES—COPARTY DISMISSED FROM SUIT. Where
a third person was brought into plaintiff's suit by a defendant's
cross-complaint and at the trial dismissed out of the case by
a final judgment, there never having been any issue between
him and the plaintiff, he is not a necessary party to plaintiff's
appeal from a subsequent final judgment which could not
affect his rights.

Appeal from a judgment of the superior court for
Spokane county, Witt, J., entered June 12, 1926, upon
the verdict of a jury in favor of the plaintiff, in an
action for fraud. Reversed.

[1]Reported in 255 Pac. 924.

*Clyde H. Belknap* and *Tustin & Chandler,* for appellants.

*G. M. Ferris* and *F. M. O'Leary,* for respondent.

PARKER, J.—The plaintiff, Sheffield, seeks recovery of damages alleged to have been suffered by him as the result of a conspiracy entered into and consummated by the defendants, Baker, Hale and Schedler, to defraud him, incident to an exchange of lands between him and one Wilkes. The case proceeded to trial in the superior court for Spokane county sitting with a jury, resulting in verdict and judgment awarding Sheffield recovery in the sum of $2,800 against Baker, Hale and Schedler, from which they have appealed to this court. The principal question calling for inquiry here is as to whether or not the trial court erred in refusing to sustain the challenge to the sufficiency of the evidence to sustain any recovery in favor of Sheffield. We, therefore, notice the facts at some length having to do with this question.

Sheffield owned, subject to a $10,000 mortgage and some unpaid interest and taxes, an improved farm of three hundred twenty acres, residing thereon, near Post Falls, Idaho, about twenty-five miles east of Spokane. For a period of some three years prior to December, 1924, Sheffield had his farm listed for sale or trade with Hale, who was a real estate agent and salesman, he being in business for himself in Spokane prior to about November 1, 1924, at which time he entered the employ of Schedler, who was engaged in the real estate and insurance business in Spokane, turning his listings over to Schedler, so that his commissions on his sales thereof would be shared by Schedler the same as his commissions on his other sales would be shared with Schedler.

Wilkes, residing in Spokane, owned, free of encum-

brance, six hundred forty acres of unimproved land situated near Bonners Ferry, Idaho, about one hundred miles. northeast of Spokane. Baker, residing in Spokane, was a friend of Wilkes, had been interested with him in the acquiring of this land and had acted as his agent in some business matters, but had not, prior to the deal in question, acted as his agent in the sale or trade of any real estate. Baker was, however, to some extent engaged in real estate sales and trades, though he had no office in that connection. Wilkes, in the fall of 1924, gave Baker to understand that he would like to dispose of his Bonners Ferry land and acquire some productive property, and, while not then expressly making Baker his agent, manifestly did encourage Baker to see what could be done looking to that end.

Soon thereafter, Baker learned of Hale's having Sheffield's farm for sale or trade, and suggested to him the possibility of an exchange. Their preliminary talk disclosed to each other that the owner of the Bonners Ferry land considered it worth fifteen dollars per acre, and that Sheffield considered his farm worth seventy dollars per acre. The name of the owner of the Bonners Ferry land was not disclosed to either Hale or Sheffield until after the exchange was consummated, nor was there any occasion for it being disclosed to either Hale or Sheffield pending the negotiations, as will presently appear. Learning this much from each other, Hale and Baker, on November 25, 1924, together drove in an automobile to Sheffield's farm near Post Falls, with a view of Baker's seeing the farm and learning whether or not Sheffield would entertain a prospective exchange for the Bonners Ferry land. They met Sheffield upon his farm and talked with him, Baker describing to him the six hundred forty acres near Bonners

Ferry, nothing being said as to the ownership of that land and no prices or terms being mentioned at that time. As to what then occurred, let Sheffield tell his own story. He testified in part as follows:

"Q. Under what circumstances did you first meet him [Baker]? A. Mr. Hale brought him there. Q. And what happened then? A. Well, Mr. Hale mentioned this trade. Q. Now just tell as nearly as you can recall what he said. A. Well, he said there was a section of land up near Bonners Ferry that he thought he could get me a trade on, and Mr. Baker described this property up at Bonners Ferry. . . . Mr. Baker told me about the land, how it laid up there and where it was situated and how they got it. He told me that at one time he and Mr. Wilkes owned this property together; that is, this other man, he did not mention Mr. Wilkes' name; and how it laid and what was on it and so on, and that he had loaned the money to pay out on it. Q. Then did either Hale or Baker make any statement to you at that time as to what Baker's interest in this transaction was? A. Well, Mr. Hale stated that Baker was a friend of the owner, and had no financial interest in it. . . . Baker said he hadn't any interest in it, he was just representing the owner as a friend. . . . Well, I told Mr. Hale when he asked me if I would consider the trade, I told him I would. Q. Then what, if anything, did Hale say about making a deal for you? A. Well, he said he would see this other party and see the best trade he could make. Q. How did they refer to the owner of the other land in talking to you? A. Well, just as this other party. Q. Then what was finally said or done about what Hale should do about making the trade, or how was it left? A. Well, he was to see what he could do in the way of a trade, how he could trade. Q. Was he to come back and see you sometime later about it? A. Yes, sir."

Hale and Baker thereupon returned to Spokane. Thereafter on the same day Hale wrote a letter to Sheffield advising him as follows:

"In pursuance to our conversation of this day, regarding exchange of farm land, wish to say that there is a possibility of the other party coming up tomorrow to inspect your land. In case said parties should come up for inspection and desire any information from you regarding the exchange, please refer them to me and state no price whatever on your property. It is my aim, if possible, to get you the deal as referred to you this morning and in case you should quote them a price it may interfere to some extent and by referring them to me there will be no chance to spoil the deal on account of mixed prices. Just leave the rest to me and I will see if I can't manage to get you the deal I spoke of."

What terms of a prospective exchange Hale had in mind in writing this letter, evidently as the result of his prior talk with Sheffield, does not appear, but evidently Sheffield and Hale had some understanding with each other as to what their proposed proposition to Baker, acting for the owner of the Bonners Ferry land, would be, and Hale did not want any inconsistency to occur between statements which he might make to Baker and statements which Sheffield might make to Baker.

On the following day, November 26, 1924, Baker took Wilkes to see Sheffield's farm. They looked over the farm, but did not see Sheffield, he being away from home. On December 2, 1924, Wilkes and Baker entered into an exchange commission contract between themselves, reciting, in substance, that Wilkes was willing to give his Bonners Ferry land and $2,800 in cash for Sheffield's farm, subject to the $10,000 mortgage; reciting therein Wilkes' six hundred forty acres of land as of the value of fifteen dollars per acre, in all $9,600, and Sheffield's three hundred twenty acre farm as of the value of seventy dollars per acre, in all $22,400, and authorizing Baker to endeavor to procure an exchange upon this basis. This exchange commission contract

also contained language claimed by Baker to provide for his commission or compensation to the extent of whatever portion of the $2,800 he might be able to save out of a consummation of an exchange; this, however, being a controversy between him and Wilkes only. There is no direct evidence that Baker or Sheffield had any knowledge whatever of the making of this exchange commission contract between Baker and Wilkes until long after the completion of the exchange.

On December 6, 1924, Hale and Baker went again to see Sheffield at his farm, with a view of seeing whether or not an exchange agreement could be agreed upon. As to what then occurred, let Sheffield tell his own story. He testified in part as follows:

"Q. When, after the receipt of this letter, was it that you next saw either Baker or Hale? A. December 6; they came to my place. My wife and my son were there. Q. Now, just tell in your own way what was said there. A. Well, Mr. Baker went on to describe the land more fully, and we discussed the trade from different angles and how the trade could be made. Q. What was said by either Baker or Hale as to how the trade could be made, as far as the other owner was concerned? A. Well, they stated that they was not sure, just sure how it could be made, but the best possible trade they could make would be my equity even for the section of land, but they didn't hardly think they could do that well. Q. Who made this statement? A. Well, Hale made the statement and Baker also. [It is evident that Hale was merely acquiescing in what Baker was there asserting. Of course, the question remains as to whether or not he was honestly so acquiescing.] Q. Did you have any knowledge or know at that time that Baker had a contract with the owner whereby the owner was willing to trade for your place and put in $2,800 to boot? A. No, sir. Q. Did they or either of them make any statement to you of that kind? A. No, sir. Q. Now then, after this talk there, what was finally done by you with reference to agreeing or not

agreeing to this deal they were putting up to you? A.
Well, he drawed up a contract, Mr. Hale did. Q. Was
anything said there in that conversation or in the first
conversation about price per acre or anything of that
kind? A. No, sir. Q. Now, after that contract had
been written out and signed by you and before these
two gentlemen left, was anything said then about
whether or not they thought they could get the other
owner to trade on that basis? A. They said they was
doubtful. Q. Who made that statement? A. Baker
first, and Mr. Hale did."

The contract then drawn up and signed was only a
so-called exchange commission contract between Shef-
field and Hale. It recited a prospective exchange of
Sheffield's three hundred twenty acre farm subject to
the $10,000 mortgage, $300 unpaid interest and $273 un-
paid taxes, with a small amount of personal property,
for the six hundred forty acres of land near Bonners
Ferry as an even trade, and authorized Hale to effect
such an exchange for Sheffield; and further containing
a stipulation that Sheffield pay Hale three hundred dol-
lars as compensation for the effecting of an exchange,
if finally made.

Two or three days later, Hale went alone to see Shef-
field at his farm. Referring to this visit, Sheffield testi-
fied in part as follows:

"Q. When did you next see or talk with either Hale
or Baker? A. Well, probably three days thereafter
Mr. Hale came back up there. Q. Tell us what Hale
said. A. Well, Mr. Hale came up there and said he
could not make the trade, unless I would throw in some
more stuff, some more hay, and either pay the ac-
cumulated interest or the taxes. Q. Did you finally
agree to this? A. Well, I agreed to pay the accumu-
lated interest or the taxes and throw in a little more
hay. Hale was alone, Baker was not along. Q. What
was said, if anything, by Hale about where you would
go to live if this deal was made? A. We discussed that

at some length, and he said he had a place listed for sale or rent that I could move into and have free of rent until the next spring sometime. It was some place close here to Spokane.''

Thereafter the exchange was consummated substantially as an even trade; that is, without Sheffield receiving any part of the $2,800 which Wilkes gave his agent, Baker, authority to give, to effect the exchange, if necessary. Appropriate conveyances were exchanged. Wilkes and Sheffield never met or became acquainted until after the closing of the deal. Hale and Wilkes never met until after the closing of the deal.

It appears that Wilkes gave to Baker, his agent, his check, payable to Baker, for $2,800, which Baker appropriated to his own use, claiming it as his compensation under his commission contract made with Wilkes, though Wilkes, upon discovering that Baker had made the exchange without using the $2,800 in connection therewith, sued Baker for the return of the $2,800. This occurred in the summer or fall of 1925. With the result of that suit, however, we are not here concerned, touching the merits of this case, offered proof thereof being excluded in the trial of this case. Thus Wilkes assumed that he was making an exchange of his land with $2,800 cash additional for Sheffield's land, subject to the encumbrances mentioned, while Sheffield assumed that he was making the exchange upon the best terms that Wilkes would agree to; that is, he assuming that Wilkes would not agree to any better terms than as the trade was consummated, which, as we have seen, did not include the payment of any money to Sheffield.

The theory upon which this action was commenced and prosecuted by Sheffield against Baker, Hale and Schedler is plainly that of conspiracy looking to defrauding him of the benefit of the better bargain which

could have been made in his behalf; that is, an exchange which should have resulted in his having the benefit of the $2,800 cash which Wilkes was willing to give to consummate the exchange. This is made plain by the following language of the complaint:

"The defendant Hale acting for himself and for the defendant Schedler, and the defendant W. C. Baker for the purpose of defrauding this plaintiff conspired together and formed a conspiracy to defraud plaintiff by falsely representing to plaintiff the terms upon which said properties could be exchanged and falsely and fraudulently as a part of said conspiracy withheld from plaintiff the fact that said owner of said Bonners Ferry property had agreed to give two thousand eight hundred dollars ($2,800) cash in addition to his property with the intention to convert said two thousand eight hundred dollars ($2,800) to their own use; and falsely represented to plaintiff that said owner of said Bonners Ferry property would only exchange properties even without the payment of any cash; that in reliance upon the said information, so falsely given by said defendants, the plaintiff agreed to and did transfer his property for said Bonners Ferry property without the payment of any cash, although owner of said Bonners Ferry property had delivered said two thousand eight hundred dollars ($2,800) to said defendants for the purpose of completing said exchange of property and that the defendants concealed said fact from plaintiff; all of said acts being done by the defendants in carrying out their scheme and plan to defraud plaintiff; and that as a result of said fraud so practiced upon plaintiff by said defendants the plaintiff has been damaged in the sum of two thousand eight hundred dollars ($2,800)."

It is plain that, at all stages of the negotiations and in the final consummation of the deal, Baker was the agent of, and acting for Wilkes, and that Hale was the agent of, and acting for, Sheffield.

There is no evidence that Schedler had anything whatever to do with the deal, other than as he might be considered Hale's employer, and, as such employer, having participated in the transaction to the extent of sharing with Hale the three hundred dollars commission or compensation paid by Sheffield to Hale for his efforts in bringing about the exchange of the lands.

This review of what we conceive to be the controlling facts has been made by us from a reading of the whole of the evidence as brought here in the statement of facts. Because of the somewhat involved nature of the controversy, we felt called upon to look to the statement of facts rather than to the abstract of the evidence, to the end that we acquire a more comprehensive view of the controversy. We think our summary above made is as favorable to the contentions here made in behalf of Sheffield as the evidence warrants.

[1] It seems plain to us that, if the evidence does not support any finding of the violation of the agency duty which Hale owed to Sheffield, then there can be no recovery by Sheffield against either Baker, Hale or Schedler. Manifestly, Baker owed no agency duty whatever to Sheffield, nor any other duty with which we are here concerned, other than to refrain from conspiring with Hale as charged, and, of course, he could not conspire with Hale except by Hale's violating his agency duty to Sheffield. Schedler, of course, could in no event be liable to Sheffield, except possibly as incident to the violation of Hale's agency duty to Sheffield; so, if as a matter of law Hale be absolved from liability to Sheffield in this case, then Baker and Schedler are necessarily also absolved from liability.

We have seen that there is no direct evidence whatever that Hale ever knew, until after the consummation of the exchange, of the existence of the exchange com-

mission contract between Wilkes and his agent Baker, wherein there is evidenced a willingness on the part of Wilkes to give $2,800, in addition to his Bonners Ferry land, for Sheffield's farm, subject to the mortgage, if necessary to effect the exchange. The very foundation of Sheffield's claim is necessarily such knowledge on the part of Hale prior to the consummation of the exchange. This knowledge on the part of Hale and the alleged conspiracy between Hale and Baker for the acquiring and sharing of the $2,800 are sought to be established by alleged suspicious circumstances which, we think, wholly fail in that behalf. We notice what seems to be the alleged principal suspicious circumstances.

It is complained generally that Hale did not procure for Sheffield as good a bargain as he should or could have procured. No complaint is made by Sheffield that the Bonners Ferry land is not as good as represented, nor is there even any complaint made by him that he did not get a good bargain, viewing the transaction as a whole. Indeed, he seems well satisfied with his bargain. He does not manifest the slightest desire to rescind; his only complaint being that his agent, Hale, failed to procure for him $2,800 in money which, seemingly, Wilkes was willing to pay in addition to his Bonners Ferry land to effect the exchange, if it could not otherwise be brought about.

It is pointed out as a suspicious circumstance that, in the writing of the letter of November 25th from Hale to Sheffield, he warned Sheffield to "state no price whatever on your property" in any talk with Baker or the owner of the Bonners Ferry land, when they would probably come to see his farm on the following day. It seems plain to us, in view of the fact that Hale had been made the agent of Sheffield, with full power of negotiation, that there was nothing at all suspicious in

this warning, but that it is wholly consistent with efficient, faithful agency service by Hale.

It is pointed out as a suspicious circumstance, as testified to by Sheffield, that both Baker and Hale informed Sheffield that Baker was acting merely as a friend for the owner of the Bonners Ferry land and had no financial interest therein. This is sought to be construed as Baker's having no financial interest, either by way of commission or as owner of that land. However, the fact remains that Baker was the agent of the unnamed Wilkes, the owner of that land, with full power of negotiation, and in no sense the agent of Sheffield. As to Hale's saying that Baker was only a friend of Wilkes, that, even if said by Hale, was only an acquiescing in what Baker himself was saying, and manifestly was the only information that Hale had upon that subject.

It is pointed out as a suspicious circumstance that both Baker and Hale, in the negotiations had with Sheffield on December 6th, expressed some doubts as to whether or not the exchange could be effected upon the terms then proposed by Sheffield, and recited in the exchange commission contract then drawn up and signed between Sheffield and Hale authorizing Hale to make the exchange on that basis, if possible. Remembering that Hale did not meet Wilkes until after the consummation of the exchange; that Baker was the only man he knew on the opposite side of the deal; that he, Hale, had no opportunity prior to the consummation of the deal to see or talk to Wilkes; that Wilkes had given Baker full agency powers in the premises and was relying wholly upon Baker's judgment and advice, as the evidence conclusively shows, we are quite unable to see these occurrences as in any substantial degree pointing to a neglect of agency duty on the part of Hale

owing to Sheffield. If Hale acquiesced with Baker in the view that it was doubtful as to the trade being made upon the terms then proposed by Sheffield, we see nothing therein inconsistent with an honest expression of opinion on that subject on the part of Hale.

It is pointed out as an alleged suspicious circumstance that the form of deed that was drawn up, by whom it is not clear, and sent by Hale to Sheffield to be executed by him and his wife conveying his farm, was left blank as to the name of the grantee. In view of the fact that there is no evidence that at that time Hale knew who the owner of the Bonners Ferry land was and had no occasion to know that fact, and that Sheffield also did not know or have occasion to know or care to know, we think the leaving of the deed blank as to the grantee does not in any manner suggest suspicion as against the acts of Hale.

Some other alleged suspicious circumstances are pointed out, but we regard them as of such minor character, even as compared with those above noticed, as not to call for serious consideration here. Having in view the entire absence of any direct evidence that Hale had any knowledge of the fact that Wilkes was willing to give $2,800 in money, in addition to his land, for Sheffield's farm, if necessary to effect the exchange; and the entire absence of any direct evidence that Hale and Baker conspired together looking to a sharing in, or that they did share in, a division of the $2,800; and what we conceive to be the manifestly unconvincing character of the alleged supicious circumstances relied upon to support the establishing of an alleged conspiracy between Baker and Hale, or between Baker, Hale and Schedler; we are fully convinced it must be decided, as a matter of law that there is an entire failure of proof to establish such alleged conspiracy,

and that, therefore, the trial court erred in refusing to sustain the challenge to the sufficiency of the evidence to support any recovery by Sheffield.

[2]   Counsel for Sheffield have moved in this court for dismissal of the appeal because of failure to serve notice thereof upon Wilkes as a party to the action in the superior court.   Being of the opinion that this motion must be denied, we have left consideration of it until this time, to the end that the exact nature of the case and Wilkes' relation thereto may be the more readily appreciated.   Soon after the commencement of the action by Sheffield, Baker responded to his complaint by a so-called "answer and cross-complaint." This was an answer to Sheffield's complaint and was also a complaint against Wilkes, asking for a judgment against Wilkes for whatever sum, if any, might be awarded in favor of Sheffield and against him (Baker) ; setting up the recovery of a judgment in the sum of $2,800 in favor of Wilkes and against him in the action above mentioned.   This cross-complaint was answered by Wilkes, in effect, putting in issue the question of that $2,800 judgment being *res judicata* of the claim made against him by Baker in his cross-complaint in this action.   Thereafter, on March 10, 1926, the case came regularly on for trial, when, before the introduction of any evidence, counsel for Wilkes moved for a dismissal of Baker's cross-complaint against him and objected to the introduction of any evidence upon the trial, looking to the support of Baker's cross-complaint against him.   Thereupon the court signed and caused to be entered a formal final order, reciting as follows:

"On this 10th day of March, 1926, this cause came regularly on for hearing by the court on objection of cross-defendants A. P. Wilkes and Mrs. A. P. Wilkes, his wife, to the introduction of any evidence, and motion to dismiss the action as to said cross defendants on the

ground that the action was barred by the judgment described in the complaint and after hearing said objection and motion and the argument of counsel and the court being fully advised in the premises, it is by the court—

"ORDERED, That said objection be, and the same is hereby sustained, and said motion is granted and said action is hereby dismissed as to said cross-defendants with their costs to be taxed by the clerk as against the cross-complaints."

Thus, there was rendered a final judgment in favor of Wilkes dismissing Baker's cross-complaint as against him. The trial then proceeded solely as a controversy between Sheffield as plaintiff, and Baker, Hale and Schedler as defendants, as originally commenced, and resulted in a final judgment to which they alone were parties, being rendered on June 12, 1926. Notice of appeal was given by counsel for Baker, Hale and Schedler in their behalf by service upon counsel for Sheffield alone on July 9, 1926. This service, it will be noticed, was made approximately more than one month after the expiration of ninety days following the final order of dismissal rendered in favor of Wilkes, which entirely absolved him from liability so far as was determinable in this case. The notice of appeal given in behalf of Baker, Hale and Schedler on July 9, 1926, expressly recites the appeal as being taken from the judgment rendered against them on June 12, 1926, so there was not sought to be brought before this court any other judgment or final order of the superior court than that final judgment. No issue was joined at any stage of the proceedings between Wilkes and Sheffield. Neither was interested in the claimed rights of the other.

We are of the opinion that the disposition of the case upon the appeal now before us, however made, could

not in the least affect any of the rights of Wilkes, and that therefore there was no necessity of serving upon him any notice of the appeal taken by Baker, Hale and Schedler. We think our decisions in *Sipes v. Puget Sound Electric R. Co.*, 50 Wash. 585, 97 Pac. 723, *Wellman v. Jensen*, 123 Wash. 310, 212 Pac. 183, *Thompson v. Mitchell*, 128 Wash. 192, 222 Pac. 617, are decisive against Sheffield upon the question of the dismissal of the appeal.

We conclude that the judgment must be reversed, and the action dismissed. It is so ordered.

MACKINTOSH, C. J., ASKREN, and TOLMAN, JJ., concur.